UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
JEROME NORTON,

        Plaintiff,

    -against-

TOWN OF BROOKHAVEN, COUNTY OF
SUFFOLK, ROBERT QUINLAN, DAVID J.
MORAN, JENNIFER LUTZER, JUSTIN
FOLBER, WILLIAM POWELL, and
VALERIE BISCARDI, all individually and in
their official capacity,

        Defendants.
-------------------------------------------------------------X

**MEMORANDUM OF
DECISION AND ORDER**
13-CV-3520 (ADS) (GRB)

APPEARANCES:

**Leeds Brown Law, P.C.**
*Attorneys for the Plaintiff*
One Old Country Road, Ste. 347
Carle Place, New York 11514
      By:    Bryan L. Arbeit, Esq.
              Rick Ostrove, Esq., Of Counsel

**Devitt Spellman Barrett LLP**
*Attorneys for Defendants Town of Brookhaven, Robert Quinlan, David J. Moran,
Jennifer Lutzer, Justin Folber, William Powell, and Valerie Biscardi*
50 Route 111
Smithtown, New York 11787
      By:    Jeltje deJong, Esq.
              Joshua S. Shteierman, Esq., Of Counsel

**The Suffolk County Attorney's Office**
*Attorneys for the Defendant County of Suffolk*
100 Veterans Memorial Highway
P.O. Box 6100
Hauppauge, New York 11788
      By:    Brian C. Mitchell, Assistant County Attorney, Of Counsel

**SPATT, District Judge.**

On June 20, 2013, the Plaintiff Jerome Norton (the "Plaintiff") commenced this action against the Defendants the Town of Brookhaven (the "Town" or "Brookhaven"), Robert Quinlan ("Quinlan"), David J. Moran ("Moran"), Jennifer Lutzer ("Lutzer"), Daniel Belano ("Belano"), Jason Folber ("Folber"), William Powell ("Powell"), Valerie Biscardi ("Biscardi," and collectively the "Brookhaven Defendants") and the County of Suffolk (the "County") pursuant to 42 U.S.C. § 1983, 28 U.S.C. § 2201, the United States Constitution, the New York State Constitution, New York State statutory law, and the common law.

In the Original Complaint, the Plaintiff brought thirteen causes of action. Thereafter, on October 9, 2013, the Plaintiff filed an Amended Complaint, and on January 14, 2014, the Plaintiff filed a Second Amended Complaint.

In the Second Amended Complaint, the Plaintiff omitted Belano as a defendant and brought the following fourteen causes of action: (1) a First Amendment intimate association claim under § 1983; (2) a retaliation claim for a First Amendment speech/right to petition claim under § 1983; (3) a malicious prosecution claim under New York State Law; (4) a *respondeat superior* liability claim for the malicious prosecution claim under New York State Law; (5) a substantive due process claim under § 1983; (6) an equal protection claim under § 1983; (7) a procedural due process claim under § 1983; (8) a Fourth Amendment claim under § 1983; (9) a Civil Rights claim under the New York Civil Rights Law § 8; (10) a claim against the Town under Monell v. Dep't of Social Servs. of City of N.Y., 436 U.S. 658, 694–95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 (1978) for violating the Plaintiff's Fourth Amendment rights under § 1983; (11) a Monell

liability claim for violating the Plaintiff's First Amendment rights, and also based on substantive due process, equal protection, and procedural due process; (12) a claim for declaratory judgment and injunctive relief against the Town; (13) a claim for declaratory judgment and injunctive relief against the County; and (14) a claim for attorney's fees under 42 U.S.C. § 1988. The only claim against the County is the claim for declaratory relief.

Presently before the Court are the respective motions by the Brookhaven Defendants and the County to dismiss the Second Amended Complaint pursuant to Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 12(b)(6) for failure to state a claim upon which relief can be granted. For the reasons set forth below, the Court grants in part and denies in part the motion to dismiss by the Brookhaven Defendants and grants the motion to dismiss by the County.

## I. BACKGROUND

A. <u>Factual History</u>

Unless otherwise stated, the following facts are drawn from the Second Amended Complaint and are construed in a light most favorable to the non-moving party, the Plaintiff.

The Plaintiff is a 50% owner of residential real property located at 66 Norfleet Lane, Coram, New York (the "Norfleet Property"). The Norfleet Property is located within the Town. In 1978, the Brookhaven Town Building Department issued a certificate of occupancy for a single-family dwelling containing three bedrooms and a cellar on the Norfleet Property. The Plaintiff's brothers, Howard Norton ("Howard") and Richard Norton ("Richard") owned the remaining 50% of the Norfleet Property.

Howard has been involved in both criminal and civil litigation against the Town of Islip ("Islip"). In 2003, he commenced a "successful prosecution of a Federal action to vindicate his constitutional rights under the Fourteenth Amendment" against Islip. (Second. Amend. Compl. ¶ 240.) On June 9, 2011, a New York State court dismissed two separate criminal actions brought against Howard by Islip, one of which was brought under Islip's rental permit law. Folber's mother was and is the Executive Director of the Town of Islip Youth Bureau, which is part of the Brookhaven Department of Housing and Human Services ("DHHS"). (Id. at ¶ 76.)

Within two weeks of the dismissal of the criminal actions against Howard, Folber, a housing inspector with DHHS visited the Northfleet Property to inspect it for violations. The inspection was not planned and a FOIL request for Folber's files regarding the inspection did not identify any complaints against the Norfleet Property that could have resulted in an inspection. (Id. at ¶ 77.) The Plaintiff alleges that Folber's inspection was initiated by or at the request of Islip officials. He further alleges that Folber's inspection was approved and condoned by Brookhaven officials, including Quinlan, who was the Town Attorney of Islip during Howard's litigations against Islip.

On June 22, 2011, Folber sent a letter order addressed to Howard, Richard and Jerome Norton (the "Owners") to Jerome's Syosset Address. The Northfleet Property deed, which is filed in the Suffolk County Clerk's Office, listed Howard's only residence as being in Lynbrook, New York, during all relevant times and Richard's only residence as being in Topanga, California. The letter order was on Town letterhead and at the bottom stated, "BY DIRECTION OF COMMISSIONER VALERIE BISCARDI." (Id. at ¶ 79). In the letter, Folber ordered the Owners to correct the following three alleged

violations: "(1) renting with a valid rental permit; (2) overhang on right of dwelling needs a permit; and (3) certificate of occupancy required for side overhang." (Id.) The letter claimed to be sent in accordance with the Town Code and Property Maintenance Code of New York State. The letter stated that the violations "must be addressed no later than July 6, 2011" and explained,

> "Following your compliance an inspection will be conducted after the time listed above. However, if it is found that the violation(s) still exist, or that an inspection has not been requested an <u>appearance ticket(s) will be issued</u>. An extension of time may be requested only by contacting the undersigned. *<u>Please note: Only non health and safety violations will be considered for an extension of time for compliance.</u>*" (emphasis in original).

The letter further stated,

> "<u>YOU ARE GIVEN NOTICE THAT FAILURE TO COMPLY WITH THIS ORDER CONSTITUTES AN OFFENSE PURSUANT TO THE NEW YORK STATE UNIFORM FIRE PREVENTION AND BUILDING CODE OR THE CODE OF THE TOWN OF BROOKHAVEN AND SHALL BE PUNISHABLE BY A FINE OR IMPRISONMENT OR BOTH</u>" (emphasis in original).

On June 30, 2011, Howard sent a letter to Folber, DHHS Commissioner Biscardi and then-DHHS Deputy Commissioner Roberta Owens ("Owens") responding to the June 22, 2011 letter order. Howard's letter addressed the legality of the alleged violations, complained that the Town's rental permit law was illegal and unconstitutional, and threatened suit against the Town and individuals involved in the enforcement of the law. He further stated that Folber's first letter order was improperly mailed to him at the Syosset address and directed future correspondence regarding the letter order be sent to his attorney.

Subsequently, Folber met with Moran, the Deputy Town Attorney for the Law Department, and possibly Biscardi, to discuss the investigation of the Norfleet Property.

The Plaintiff alleges that Moran encouraged and advised Biscardi to instruct and/or direct Folber to expand the investigation by searching the Norfleet Property without seeking consent of the Owners or obtaining a warrant. The Plaintiff further alleges that Biscardi instructed and directed Folber to follow Moran's instructions. (Id. at ¶¶ 84–85.)

On July 11, 2011, Folber returned and entered the Northfleet Property without a warrant. To gain access to the property, Folber falsely advised the then occupants of the property that Folber was at the Norfleet Property to do an interior and exterior inspection at the request of "Mr. Norton". (Id. at ¶ 88.) Folber took photographs of the inside and outside of the Norfleet Property dwelling.

The following day, Folber met with Moran to discuss the information he obtained from his search of the Norfleet Property. After this meeting, Folber sent a second letter order dated July 12, 2011 to the Plaintiff's Syosset address. In that letter, Folber re-ordered the correction of the three original alleged violations in the first letter order and ordered the correction of an additional sixteen alleged violations, for a total of nineteen alleged violations. The July 12, 2011 letter order was similar in all respects to the first letter order and stated that a compliance inspection would take place after July 26, 2011. On July 13, 2011, Folber notified Moran that he sent the second letter order and said he would update Moran if he heard from Howard or his attorney.

On July 26, 2011, the Plaintiff responded to the second letter order by mailing to Folber a letter and attachments. In his letter and attachments, the Plaintiff objected to Folber's authority to administer and enforce the Town and Uniform Code. The Plaintiff also objected to the Town Rental Code as invalid and unconstitutional. On August 3, 2011, the Plaintiff sent Folber a letter with a copy of an electrical inspection certificate,

which stated the Norfleet Property was in compliance with the Residential Code and Building Code of New York.

On August 26, 2011, Folber amended and reissued the June 22, 2011 letter order by advising that this letter was the "final notice before tickets" and requiring the owners to schedule a compliance inspection by September 6, 2011. (Id. at ¶ 99.)

On September 6, 2011, the Plaintiff informed Folber and Biscardi via letter that the Plaintiff would permit an inspection by the Town Chief Building Inspector or an authorized subordinate if the Town Chief Building Inspector found the inspection necessary. The following day, Folber met with Moran to discuss the Norfleet Property investigation. Folber discussed this meeting with Biscardi and later had a second meeting with both Moran and Biscardi.

On an unspecified date, Folber issued fourteen appearance tickets solely to the Plaintiff, all with a violation date and time on July 11, 2011 at 11:51 a.m. and an appearance date of December 22, 2011 at 9:00 a.m. The Plaintiff alleges that at the time the tickets were issued, the Town did not authorize Folber to issue and serve appearance tickets. (Id. at ¶¶ 35–36.) After issuing the appearance tickets, the Town hired a process server, who served the appearance tickets upon the gatehouse guard of the gated community where the Plaintiff resides. Copies of the appearance tickets were also mailed to the Plaintiff. The Plaintiff alleges that the process server was not authorized by state law or local law to serve the appearance tickets. (Id. at ¶ 114.)

On September 19, 2011, the Plaintiff met with Deputy Commissioner Owens regarding the Norfleet Property. The Plaintiff offered Owens an opportunity to inspect the property but she declined. Owens allegedly declined because Biscardi instructed her

to "stand down" from any further involvement regarding the Plaintiff and the Norfleet Property. Owens allegedly told the Plaintiff that Biscardi wanted the Plaintiff criminally prosecuted. Owens further told the Plaintiff that certain Town property owners sometimes took and sent photographs of their property to Town personnel to document the conditions of their property.

The next day, the Plaintiff mailed Folber a letter with a compact-disc containing fifty-six photographs of the Norfleet Property taken on September 19 and 20, 2011. These photographs concerned the alleged violations in Folber's previous letter orders. The Plaintiff also attached a fire underwriter's certificate of compliance. In his letter, the Plaintiff reiterated his willingness to allow the Town Building Inspector, or an authorized subordinate, to inspect the Norfleet property, if the Town Building Inspector found the inspection necessary. Copies of the September 20, 2011 letter, attachments, and photographs were sent to Biscardi and Owens. After receiving the letter, Folber asked Moran to meet with him and Biscardi to discuss the situation.

On December 8, 2011, the Plaintiff received a DHHS envelope containing an unsigned notice adjourning his Town Ordinance Court appearance. Four days later, the Plaintiff sent nine notices of claim to both the Town Clerk and to Town Attorney Quinlan. In the notices, the Plaintiff alleged wrongdoing by the Town and the Town officers in regards to nine of the fourteen Appearance Tickets that Folber issued to the Plaintiff.

On December 18, 2011, the Plaintiff's criminal counsel, Bryan Van Cott ("Van Cott"), a partner at the law firm of Twomey, Latham, Shea, Kelly, Dubin & Quartararo LLP ("Twomey Latham"), wrote Quinlan regarding the legal deficiencies concerning the

Norfleet Property and the Appearance Tickets. Neither the Town nor Quinlan took any corrective actions in response to Van Cott's letter. Prior to December 22, 2011, the Plaintiff visited the court to determine whether the Accusatory Instruments were filed for the December 22, 2011 appearance date. He was advised that they had not yet been filed.

On January 3 and 4, 2012, Folber signed and issued a total of fourteen accusatory instruments (the "Accusatory Instruments") regarding the Norfleet Property solely to the Plaintiff. The Accusatory Instruments dated January 3, 2012 accused the Plaintiff of the three violations appearing in the initial June 22, 2011 letter order. The Accusatory Instruments dated January 4, 2012 accused the Plaintiff of the violations appearing in the July 12, 2011 letter order.

Powell, who at all relevant times was a Senior Housing Inspector for the DHHS, was Folber's immediate supervisor. The Plaintiff alleges that Powell supervised and assisted Folber in the drafting and issuance of the Accusatory Instruments. (Id. at 139.) Six of the Accusatory Instruments charged the Plaintiff with violating the Uniform Code, all of which, the Plaintiff contends, the Town lacked the authority to prosecute. Furthermore, the Plaintiff alleges that Folber lied regarding the deadlines for compliance; ignored the Plaintiff's attempts to demonstrate compliance; and instead demanded that the Plaintiff submit to a warrantless inspection. All the Accusatory Instruments stated that the information contained therein was based on personal knowledge of Folber and upon information and belief derived from a search of records contained in the Town's Assessor's office. However, the Plaintiff contends that the Town lacked probable cause for the prosecutions because the Accusatory Instruments did not identify the factual portions based on Folber's personal knowledge; no records or supporting depositions

were attached to the Accusatory Instruments; and the instruments were otherwise facially insufficient.  (Id. at ¶¶ 158–162.)

On January 11, 2012, the appearance date was adjourned to February 2, 2012. The Plaintiff did not receive direct notice of the adjournment, but rather learned of the adjournment because his attorney inquired about the matter.  On the following day, the Accusatory Instruments were filed with the State Court.

On February 2, 2012, prior to the start of the State Court proceedings, Van Cott delivered to the State Court a letter detailing the insufficiencies of the Accusatory Instruments and the ineffectiveness of any alleged service of the Appearance Tickets upon the Plaintiff.  A copy was also delivered to Jennifer Lutzer, who was an Assistant Town Attorney in the Law Department, prior to the start of the State Court proceedings. The Plaintiff was not present at the State Court proceedings.  Van Cott appeared instead, although he was not authorized to consent to any arraignment or adjournment.

When the State Court proceedings began, the judge, the Hon. James P. Flanagan ("Judge Flanagan"), acknowledged receipt of Van Cott's letter but refused to read it stating he could not grant a dismissal based on the letter "no matter how true the contents may be."  (Id. at ¶ 175.)  Moran silently acquiesced and allegedly did not inform Judge Flanagan that the State Court had an independent duty to review the Accusatory Instruments.  Judge Flanagan directed Moran to bring an arrest warrant for the next scheduled appearance and if the Plaintiff did not appear, Judge Flanagan would sign the arrest warrant for immediate execution.  Judge Flanagan further threatened that if the Town did not receive the opportunity to re-inspect the property, he would sign an order to show cause to "shut down the place."  (Id. at ¶ 178.)  Lastly, Judge Flanagan announced

"NAD", or "no appearance defendant", and ordered that the cases be placed on the February 9, 2012 calendar.

On February 9, 2012, Van Cott delivered to the State Court a second letter attached with the August 3, 2011 Inspection Certificate and an Inspection Certificate dated February 8, 2012. Both certificates stated that the Norfleet Property was in compliance with the Residential Code and Building Code of New York. The Plaintiff was not present but again Van Cott was present on the Plaintiff's behalf. Judge Flanagan reiterated that he would not read Van Cott's letter and requested that Moran, who appeared on behalf of the People, provide the court with an arrest warrant. Assistant Town Attorney Belano applied for two arrest warrants the same day and a hearing on the warrant applications was scheduled for February 16, 2012.

A week later, on the day of the hearing, Van Cott delivered to the State Court another letter concerning the Plaintiff and the Norfleet Property. In the letter, Van Cott complained that the Accusatory Instruments were invalid and the Law Department did not have authority to prosecute the Accusatory Instruments. A copy of the letter was faxed to the Law Department. Although the Plaintiff did not appear at the hearing, the hearing was adjourned because the files were not in the courtroom.

On February 22, 2012, Quinlan telephoned John Shea ("Shea"), a partner at Twomey Latham, and requested that Twomey Latham withdraw as Plaintiff's defense counsel. The next day, Quinlan met with Judge Flanagan about Van Cott's letters. Shortly after the meeting, there was a hearing regarding the warrant applications. Again, the Plaintiff did not appear at the hearing. Judge Flanagan returned Van Cott's letters and attachments to Van Cott and restated he would not read them. The Judge instructed Van

Cott not to send him any more letters.  On February 24, 2012, a court notice was mailed to the Plaintiff advising him to appear on March 8, 2012.  The Plaintiff alleges that the notice was "materially misleading."  (Id. at ¶ 199.)

On March 6, 2012, the Plaintiff's other counsel, Leeds Brown, sent a letter to a new judge complaining on behalf of the Plaintiff that the Accusatory Instruments were jurisdictionally defective.  A copy of the letter was sent to both Moran and to the County District Attorney.

On March 8, 2012, Lutzer made applications for two criminal summonses.  The Plaintiff alleges that within the applications, Lutzer falsely claimed that the Plaintiff was previously served with a summons on September 16, 2011 at his Syosset address.  (Id. at ¶ 202.)  Later that day, an arraignment was held on the Accusatory Instruments but the Plaintiff did not appear.  Moran appeared on behalf of the People and asked to amend the pending applications for arrest warrants to applications for criminal summonses.  Judge Flanagan stated that he mistakenly signed the arrest warrants but that the warrants were not approved.  Judge Flanagan returned the arrest warrant applications to Moran and ordered, *sua sponte*, that a notice be sent to the Plaintiff.

The proceedings were adjourned to March 22, 2012 and a letter was mailed to the Plaintiff advising him that his failure to appear on March 22, 2012 may result in the issuance of a criminal summons.  The Plaintiff alleges that this notice was neither authorized nor permitted.  (Id. at ¶ 209.)

On March 19, 2012, Leeds Brown sent letters to Moran and the District Attorney complaining that the Town lacked the authority to prosecute the Plaintiff and the Accusatory Instruments against the Plaintiff were jurisdictionally defective.  Within a few

days, the District Attorney directed Quinlan to dismiss the Accusatory Instruments that alleged violations of the Uniform Code.

On March 22, 2012, an arraignment was held. Again, the Plaintiff did not appear and Moran appeared on behalf of the People. The State Court Judge approved both criminal summons applications for all fourteen Accusatory Instruments. Moran then moved to dismiss the six Uniform Code Accusatory Instruments on the basis that they were deemed insufficient. The State Court granted Moran's motion on Criminal Procedure Law ("CPL") § 170.35 grounds "in spite of the fact that Plaintiff had never been arraigned on any of the six Uniform Code Accusatory Instruments." (Id. at ¶ 215.) The Plaintiff alleges that a § 170.35 dismissal is permitted only after arraignment and only on motion of the defendant. (Id.) The State Court proceeded to set a service date for the criminal summonses for April 19, 2012. This date was more than 90 days after the Accusatory Instruments were filed. Although the two criminal summonses were to be served by "COMPLAINANT: INVESTIGATOR, BROOKHAVEN TOWN ATTORNEY OFFICE", a private investigation firm was hired to serve the two summonses. The private investigator failed to successfully serve the summonses on the Plaintiff and instead served the summonses upon a person who was not the Plaintiff. (Id. at ¶¶ 219–222.)

On April 17, 2012, Van Cott wrote to Moran advising him that the Town prosecutors failed to be ready for trial within 90 days of the issuance of the remaining Accusatory Instruments and were in violation of the Plaintiff's right to a speedy trial.

On April 19, 2012, Lutzer moved to dismiss the remaining eight Accusatory Instruments based on CPL "170.40 failure to serve a criminal summons," even though the

Plaintiff had never been arraigned. The Plaintiff alleges that the State Court granted the motion to dismiss without providing the reasons for the dismissal on the record as required by § 170.40(2). Furthermore, according to the Plaintiff, the failure to serve the remaining instruments would not alone be a "compelling factor, consideration or circumstance clearly demonstrating that conviction or prosecution of the defendant upon such accusatory instrument or count would constitute or result in injustice." (Id. at ¶¶ 227–228.)

B. Procedural History

On April 11, 2012, the Plaintiff filed and served six separate notices of claims against the Town and against the County for claims arising out of the investigation and prosecution of the Uniform Code Accusatory Instruments. On June 13, 2012, the Plaintiff filed and served fourteen notices of claims, six of which were clarifications of the Plaintiff's April 11, 2012 notices of claims, against the Town and against the County.

Thereafter, on June 20, 2013, the Plaintiff commenced this action against the named Defendants. As stated above, the Plaintiff named as Defendants the Town, the county, and Quinlan, Moran, Lutzer, Belano, Folber, Powell, and Biscardi (the "Individual Defendants").

As previously stated, in the Second Amended Complaint, the Plaintiff asserts the following fourteen causes of action: (1) a First Amendment claim to intimate association claim under § 1983; (2) a retaliation claim for First Amendment speech/right to petition claim under § 1983; (3) a malicious prosecution claim under New York State Law; (4) a respondeat superior liability claim for malicious prosecution under New York State Law; (5) a substantive due process claim under § 1983; (6) an equal protection claim under §

1983; (7) a procedural due process claim under § 1983; (8) a Fourth Amendment claim under § 1983; (9) a Civil Rights claim under the New York Civil Rights Law § 8; (10) a claim under <u>Monell</u> against the Town for violating the Plaintiff's Fourth Amendment rights under § 1983; (11) a <u>Monell</u> claim against the Town for violating the Plaintiff's First Amendment rights, substantive due process, equal protection, and procedural due process; (12) a claim for declaratory judgment and injunctive relief against the Town; (13) a claim for declaratory judgment and injunctive relief against the County; and (14) a claim for attorney's fees under 42 U.S.C. § 1988. The only claim against the County is the claim for declaratory relief.

On February 21, 2014, the Brookhaven Defendants moved, pursuant to Fed. R. Civ. P. 12(b)(6), to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted. However, the Brookhaven Defendants make no argument against the Plaintiff's Section 1983 Fourth Amendment claim, and the motion to dismiss that claim is denied. <u>See</u> <u>Paulino v. Carrion</u>, 07 CIV. 5773 (LAK)(GWG), 2008 WL 2627767, at *4 (S.D.N.Y. July 1, 2008)("The State defendant makes no argument that the federal claim under 42 U.S.C. § 1983 is frivolous . . . Accordingly, the arguments regarding the merits of this claim need not be considered.").

On March 24, 2014, the County also moved pursuant to Fed. R. Civ. P. 12(b)(6) to dismiss the Second Amended Complaint for failure to state a claim upon which relief can be granted.

In opposition to the motions to dismiss, the Plaintiff withdrew his claim under Substantive Due Process.

## II. DISCUSSION

A. The Standard for a Rule 12(b)(6) Motion

In reviewing a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the plaintiff. See e.g., Cleveland v. Caplaw Enters., 448 F.3d 518, 521 (2d Cir. 2006); Nechis v. Oxford Health Plans, Inc., 421 F.3d 96, 100 (2d Cir. 2005). "In order to survive a motion to dismiss under Rule 12(b)(6), a complaint must allege a plausible set of facts sufficient 'to raise a right to relief above the speculative level.'" Operating Local 649 Annuity Trust Fund v. Smith Barney Fund Mgmt. LLC, 595 F.3d 86, 91 (2d Cir. 2010) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)). This standard does not require "heightened fact pleading of specifics, but only enough facts to state a claim to relief that is plausible on its face." Twombly, 550 U.S. at 570.

The Supreme Court clarified the appropriate pleading standard in Ashcroft v. Iqbal, setting forth two principles for a district court to follow in deciding a motion to dismiss. 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). The Court instructed district courts first to "identify[ ] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." Id. at 679. "While legal conclusions can provide the framework of a complaint, they must be supported by factual allegations." Id. Second, if a complaint contains "well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." Id.

Finally, the Court notes that, in adjudicating a motion to dismiss under Rule 12(b)(6), it is entitled to consider the following: (1) facts alleged in the complaint and

documents attached to it or incorporated in it by reference; (2) documents integral to the complaint and relied upon in it, even if not attached or incorporated by reference; (3) documents or information contained in defendant's motion papers if plaintiff has knowledge or possession of the material and relied on it in framing the complaint; (4) public disclosure documents required by law to be, and that have been, filed with the Securities and Exchange Commission; and (5) facts of which judicial notice may properly be taken under Rule 201 of the Federal Rules of Evidence. See Jones v. Nickens, 961 F. Supp. 2d 475, 483 (E.D.N.Y. 2013); David Lerner Assocs., Inc. v. Phila. Indem. Ins. Co., 934 F. Supp. 2d 533, 539 (E.D.N.Y. 2013), aff'd, 542 F. App'x 89 (2d Cir. 2013); SC Note Acquisitions, LLC v. Wells Fargo Bank, N.A., 934 F. Supp. 2d 516, 524 (E.D.N.Y. 2013), aff'd, 548 F. App'x 741 (2d Cir. 2014).

B.  Immunity to Suit

As an initial matter, the Court notes that the Defendants have not sought qualified immunity and therefore that defense is waived for purposes of this motion. Yeshiva Chofetz Chaim Radin, Inc. v. Vill. of New Hempstead by its Bd. of Trs. of Vill. of New Hempstead, 98 F. Supp. 2d 347, 357 (S.D.N.Y. 2000).

With regard to absolute immunity, the Court notes that the Defendants draw no distinction between federal and state-law claims, "nor do they recognize the distinction between New York's common law immunity principles and the very different guidelines that govern immunity under federal civil rights claims." Id. at 356; see Cornejo v. Bell, 592 F.3d 121, 130 (2d Cir. 2010) (noting that the "issue of immunity . . . differs as between the state and federal law"); S. Carolina v. Baker, 485 U.S. 505, 518 n. 11, 108 S. Ct. 1355, 99 L. Ed. 2d 592 (1988) (noting the "sources of the state and federal immunities

are, of course, different"). Thus, at this stage of the litigation, the Court declines to recognize absolute immunity against the Plaintiff's state law claims.

Turning to the Defendants' arguments in favor of immunity under federal law, "[i]t is by now well established that 'a state prosecuting attorney who acted within the scope of his duties in initiating and pursuing a criminal prosecution' 'is immune from a civil suit for damages under § 1983.'" Shmueli v. City of New York, 424 F.3d 231, 236 (2d Cir. 2005) (quoting Imbler v. Pachtman, 424 U.S. 409, 410, 431, 96 S. Ct. 984, 47 L. Ed. 2d 128 (1976)). "[D]istrict courts are encouraged to determine the availability of an absolute immunity defense at the earliest appropriate stage, and preferably before discovery. This is because '[a]n absolute immunity defeats a suit at the outset, so long as the official's actions were within the scope of the immunity.'" Deronette v. City of New York, No. 05–CV–527 (SJ), 2007 WL 951925, at *4, 2007 U.S. Dist. LEXIS 21766, at *12 (E.D.N.Y. Mar. 27, 2007) (citing Mitchell v. Forsyth, 472 U.S. 511, 526, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) and quoting Imbler, 424 U.S. at 419 n. 13, 96 S. Ct. 984 (additional citations omitted)).

"[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question", Burns v. Reed, 500 U.S. 478, 486, 111 S. Ct. 1934, 114 L. Ed. 2d 547 (1991), and "[t]he ultimate question [ ] is whether the prosecutors have carried their burden of establishing that they were functioning as advocates when they engaged in the challenged conduct." Doe v. Phillips, 81 F.3d 1204, 1209 (2d Cir. 1996) (internal quotation marks omitted).

However, the Second Circuit has held that, in the context of a motion to dismiss under Rule 12(b)(6), "when it may not be gleaned from the complaint whether the

conduct objected to was performed by the prosecutor in an advocacy or an investigatory role, the availability of absolute immunity from claims based on such conduct cannot be decided as a matter of law on a motion to dismiss." Hill v. City of New York, 45 F.3d 653, 663 (2d Cir. 1995).

"In determining whether absolute immunity obtains, [the courts] apply a 'functional approach,' looking to the function being performed rather than to the office or identity of the defendant." Hill, 45 F.3d at 660 (quoting Buckley v. Fitzsimmons, 509 U.S. 259, 269, 113 S. Ct. 2606, 125 L. Ed. 2d 209 (1993)). In applying this functional approach, the Second Circuit has held that prosecutors are entitled to absolute immunity for conduct "'intimately associated with the judicial phase of the criminal process.'" Fielding v. Tollaksen, 257 F. App'x. 400, 401 (2d Cir. 2007) (citation omitted); Hill, 45 F.3d at 661 (same). In particular, "[s]uch Imbler immunity . . . extends to acts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as advocate for the State." Smith v. Garretto, 147 F.3d 91, 94 (2d Cir. 1998)(citation and quotation marks omitted).

On the other hand, "[w]hen a district attorney functions outside his or her role as an advocate for the People, the shield of immunity is absent. Immunity does not protect those acts a prosecutor performs in administration or investigation not undertaken in preparation for judicial proceedings." Hill, 45 F.3d at 661; see also Carbajal v. Cnty. of Nassau, 271 F. Supp. 2d 415, 421 (E.D.N.Y. 2003) ("[W]hen a prosecutor supervises, conducts, or assists in the investigation of a crime, or gives advice as to the existence of probable cause to make a warrantless arrest — that is, when he performs functions

normally associated with a police investigation — he loses his absolute protection from liability.")(citation omitted).

The Second Circuit has noted that "[t]he line between a prosecutor's advocacy and investigating roles might sometimes be difficult to draw." Zahrey v. Coffey, 221 F.3d 342, 347 (2d Cir. 2000). However, the Court "may rely on certain established distinctions between these roles." Conte v. Cnty. Of Nassau, 06-CV-4746 (JFB)(ETB), 2010 WL 3924677, at *23 (E.D.N.Y. Sept. 30, 2010). For example, the Supreme Court has explained that "[t]here is a difference between the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." Buckley, 509 U.S. at 273, 113 S. Ct. 2606.

In addition, the Second Circuit has identified the juncture in the criminal process before which absolute immunity may not apply. Specifically, "[t]he majority opinion in [Buckley] suggests that a prosecutor's conduct prior to the establishment of probable cause should be considered investigative: 'A prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested.'" Zahrey, 221 F.3d at 347 n. 2 (quoting Buckley, 509 U.S. at 274, 113 S. Ct. 2606, 125 L. Ed. 2d 209); see also Hill, 45 F.3d at 661 ("Before any formal legal proceeding has begun and before there is probable cause to arrest, it follows that a prosecutor receives only qualified immunity for his acts.").

Thus, in interpreting Buckley, the Second Circuit has distinguished between "preparing for the presentation of an existing case," on the one hand, and attempting to

"furnish evidence on which a prosecution could be based," on the other hand — only the former entitles a prosecutor to absolute immunity. Smith, 147 F.3d at 94. Furthermore, "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." Id. at 274 n. 5, 113 S. Ct. 2606; see Zahrey, 221 F.3d at 347 n. 2 ("All members of the Court [in Buckley] recognized . . . that a prosecutor's conduct even after probable cause exists might be investigative.").

Applying the functional test to the allegations contained in the Second Amended Complaint, the Court considers federal absolute immunity with respect to each of the Individual Defendants.

As to Folber, the Brookhaven Defendants claim absolute immunity for his preparation of the accusatory instruments. In opposition, the Plaintiff contends that Folber acted in the "clear absence of all jurisdiction" or "without any colorable claim of authority," Barr v. Abrams, 810 F.2d 358, 361 (2d Cir. 1987), and, therefore, he does not enjoy absolute immunity for this act.

However, the Court need not decide whether Folber acted in the "clear absence of all jurisdiction" because his swearing to facts in a criminal accusatory instrument is not a function for which absolute immunity is afforded. Kalina v. Fletcher, 522 U.S. 118, 130–31, 118 S. Ct. 502, 139 L. Ed. 2d 471 (1997) (holding that the prosecutor was not entitled to absolute immunity for acting as a complaining witness). Accordingly, Folber's actions taken as part of his preparation and execution of the accusatory instruments are not entitled to absolute immunity.

As to Moran and Lutzer, the Court recognizes, and the Plaintiff does not contest, their entitlement to absolute immunity for their appearances in State Court, requests to amend the applications for arrest warrants to criminal summonses, and motions to dismiss the accusatory instruments. However, insofar as the remainder of the Plaintiff's allegations as to Moran and Lutzer concern investigatory work – including Moran's alleged encouraging of Folber to file a complaint against the Plaintiff – the Court finds that these acts do not receive absolute immunity.

As to Quinlan, the Second Amended Complaint asserts that he failed to take any corrective action in response to the Plaintiff's notices of claim or Van Cott's letter, and that Quinlan was involved in the investigation of the Plaintiff's property. The Plaintiff maintains that because these acts occurred before probable cause existed and before any formal legal proceeding was commenced, absolute immunity cannot attach.

Relying on Van de Kamp v. Goldstein, 555 U.S. 335, 129 S. Ct. 855, 172 L. Ed. 2d 706 (2009), the Brookhaven Defendants argue that Quinlan is entitled to absolute immunity for this pre-prosecution conduct. In Van de Kamp, the plaintiff claimed that the district attorney and his chief assistant failed to adequately train and supervise their deputies on the production of impeachment material to defendants, and failed to create an information system for their deputies handling such cases to access such information. The Supreme Court found that absolute immunity barred the claims, reasoning that the failure to supervise and train claims relied upon underlying misconduct by the deputy prosecutors at trial, who were themselves entitled to absolute immunity.

Here, by contrast, the Court finds that, aside from Quinlan's role in connection with the issuance of the Appearance Tickets, none of the pre-prosecution functions for

which Quinlan claims absolute immunity involved a supervisory role of a prosecutor's conduct at trial. Thus, Quinlan is not entitled to absolute immunity for these pre-prosecution actions.

As to Quinlan's actions taken after the criminal prosecutions, the Plaintiff contends that Quinlan is not entitled to absolute immunity for his *ex parte* conversations with the State Court judge because it is against New York State Judicial ethical rules to partake in *ex parte* communications concerning a pending proceeding outside the presence of the opposing parties or their attorneys. However, a prosecutor's wrongful act, such as *ex parte* communications with a judge, "is certainly not something that is properly within the role of a prosecutor," but that "is immaterial, because [the] immunity attaches to his function, not to the manner in which he performed it." Dory v. Ryan, 25 F.3d 81, 83 (2d Cir. 1994) (internal quotation marks and citation omitted). The absolute character of absolute immunity is that it "protects a prosecutor from § 1983 liability for virtually all acts, regardless of motivation, associated with his function as an advocate." Id.

In Dory, a prosecutor who allegedly participated in a conspiracy to present false evidence at trial was held to be absolutely immune, id., because the "professional evaluation of the evidence . . . and appropriate preparation for its presentation at trial" are prosecutorial acts. Buckley, 509 U.S. at 271, 113 S. Ct. 2606, 125 L. Ed. 2d 209 ; see also Brodnicki v. City of Omaha, 75 F.3d 1261, 1267 (8th Cir. 1996) (the prosecutor who allegedly violated the plaintiff's right to due process by examining evidence prior to trial and discussing charges with the defense counsel was entitled to absolute immunity).

In Pinaud v. County of Suffolk, 52 F.3d 1139, 1148 (2d Cir. 1995), the Second Circuit granted absolute immunity to prosecutors who allegedly violated the plaintiff's rights under the Fourth, Fifth, Sixth and Eighth Amendments by: seeking improperly to increase the plaintiff's bail; making false representations to prompt a plea agreement, and then breaching that agreement; manufacturing a bail jumping charge; making misrepresentations to the Bureau of Prisons; and unnecessarily transferring the plaintiff from county to state jail. 52 F.3d at 1149. These alleged acts, while "unethical, deviant, and violative of the plaintiffs' constitutional rights, were 'components of the initiation and presentation of a prosecution, and therefore . . . protected by absolute immunity.'" Phillips, 81 F.3d at 1213 (citing Pinaud).

"In short, absolute immunity insulates prosecutorial misconduct — however outrageous — so long as the misconduct is prosecutorial." Phillips, 81 F.3d at 1213. Thus, Quinlan's *ex parte* conversation with the State Court judge is protected by absolute immunity.

Finally, as to Powell and Biscardi, the Second Amended Complaint alleges that Biscardi was a department head and chief policy-maker and that Powell acted in a supervisory capacity over Folber.

The Defendants maintain that Van de Kamp confers absolute immunity for Biscardi's and Powell's supervisory "approval and directions." (Defs. Mem. at 11). However, Van de Kamp does not afford immunity for supervisory decisions unless they relate to conduct during the prosecution. The record indicates that Biscardi and Powell supervised Folber during his investigations. Such conduct is unlikely to lead to an error "in the midst of trial." Van de Kamp, 129 S. Ct. at 863.

Contrary to the Brookhaven Defendants' contention, Spear v. Town of West Hartford, 954 F.2d 63 (2d Cir. 1992), cert. denied, 506 U.S. 819, 113 S. Ct. 66, 121 L. Ed. 2d 33 (1992) is also distinguishable. There, a municipal resolution authorized the Corporation Counsel to take legal action to prevent illegal protest activities in West Hartford. Id. at 65. After an anti-abortion protest at a women's health care facility, the Corporation Counsel commenced an action, alleging Racketeer Influenced and Corruption Organizations Act, 18 U.S.C. §§ 1961 et seq. and nuisance claims to prevent future protest activities. One defendant in the action, Spear, had written an editorial criticizing police efforts to disband the protest, giving rise to the Corporation Counsel's suit.

After the claims against Spear were dropped by the town, he commenced an action under § 1983 claiming that the lawsuit against him was based solely on his editorial in contravention of his First Amendment rights. Id. Concluding that absolute immunity barred Spear's action, the court held that absolute immunity extends "to the initiation of civil lawsuits as well as to administrative proceedings. . . . Thus, when a high executive officer of a municipality authorizes a civil lawsuit in pursuit of that municipality's governmental interests, absolute immunity attaches." Id. at 66; see also Mendenhall v. Goldsmith, 59 F.3d 685, 691 (7th Cir. 1995) (holding that the prosecutor's conduct in filing for an injunction in civil forfeiture case was entitled to absolute immunity because the prosecutor "acted pursuant to the authority vested in him under [state] law, functioning purely in his capacity as an advocate for the state."), cert. denied, 516 U.S. 1011, 116 S. Ct. 568, 133 L. Ed. 2d 492 (1995); Schrob v. Catterson, 948 F.2d

1402, 1416 (3d Cir. 1991) (holding that the prosecutor seeking a seizure warrant in a civil forfeiture action was entitled to absolute immunity).

However, unlike in <u>Spear</u>, it is alleged that Biscardi and Powell lacked authority to initiate criminal actions and that their causing the initiation of the criminal actions was a complaining witness function. <u>Spears</u>, 954 F.2d 66 ("Were [defendant], who was not only acting Town Manager but also Police Chief, involved in this matter as a complaining witness rather than as an executive officer authorizing suit, he would not receive absolute immunity.")  At this stage of the litigation, the Court declines to recognize Biscardi and Powell's entitlement to absolute immunity.

C.  <u>The First Amendment Intimate Association Claim</u>

The Plaintiff alleges that the Brookhaven Defendants interfered with his right to intimate association.  In essence, the Plaintiff alleges that the Brookhaven Defendants' retaliatory conduct in subjecting him to investigation and criminal actions as a result of his brother Howard's litigation against Islip interfered with the Plaintiff's right to associate with Howard.

"The right to intimate association protects the close ties between individuals from inappropriate interference by the power of the state." <u>Chi Iota Colony of Alpha Epsilon Pi Fraternity v. C.U.N.Y.</u>, 502 F.3d 136, 143 (2d Cir. 2007).  To determine whether certain familial relationships warrant protection, a court must "assess such factors as cohabitation and the precise degree of kinship." <u>Patel v. Searles</u>, 305 F.3d 130, 136 (2d Cir. 2002).  The sibling relationship is one recognized as warranting protection. <u>Id.</u> ("the relationships at issue in this case — those between [plaintiff] and his father, siblings, wife, and children — receive the greatest degree of protection because they are among

the most intimate of relationships"); <u>Berrios v. State Univ. of New York at Stony Brook</u>, 518 F. Supp. 2d 409, 418 (E.D.N.Y. 2007) ("the right of intimate association encompasses the husband/wife relationship . . . as well as the familial relationships between parents, siblings and children").

Here, the Brookhaven Defendants argue that the intimate association claim should be dismissed because there is no nexus between Howard's protected activities and the alleged retaliatory conduct, and the sibling relationship between Howard and the Plaintiff was neither targeted nor impaired. The Court disagrees.

As to the nexus, the Second Amended Complaint alleges that (1) Quinlan was the Islip Town Attorney immediately before becoming the Brookhaven Town Attorney and (2) Folber's mother was an Executive Director in Islip in the same department that Folber worked for in Brookhaven. Further buttressing the allegations of a nexus between Howard's protected activities and the alleged retaliatory conduct is the temporal proximity of the underlying events — that is, less than two weeks between the dismissal of Howard's criminal actions and the beginning of the alleged retaliatory conduct. The Court also notes that the Plaintiff alleges that there were no legitimate reasons why his property was selected for investigation, particularly given that FOIL requests revealed there were no complaints about the property.

As to the supposed lack of targeting or impairment of the relationship between the Plaintiff and Howard, the "[Second] Circuit has never held that a challenged action must be directed at a protected relationship for it to infringe on the right to intimate association." <u>Patel</u>, 305 F.3d at 137. Further, the "Defendants cite no authority supporting their argument that where a defendant's conduct was allegedly undertaken for

the very purpose of harming or impairing an intimate relationship, said defendant's efforts must be alleged to have been successful in order for a plaintiff to state a claim. In fact, the cases reviewed by the Court seem to suggest the opposite." Agostino v. Simpson, 08-CV-5760 (CS), 2008 WL 4906140 (S.D.N.Y. Nov. 17, 2008); see e.g., Adler, 185 F.3d at 45 ("If simple vindictiveness against the plaintiff on account of his wife's lawsuit was the defendants' true motive, a First Amendment violation would be established."); Sutton v. Vill. of Valley Stream, N.Y., 96 F. Supp. 2d 189, 193 (E.D.N.Y. 2000)("If . . . it is proven that 'simple vindictiveness' was defendants' true motive, the First Amendment will have been violated.").

The Brookhaven Defendants' reliance on Garten v. Hochman, No. 08 Civ. 9425(PGG), 2010 WL 2465479, at *4 (S.D.N.Y. June 16, 2010) is misplaced. In Garten, the plaintiff alleged that the forced transfer of his two children to a different school within the school district was intended to punish him and to interfere in his relationship with his children. However, the court found that since the complaint acknowledged that the transfer stemmed a change in residence, the plaintiff did not allege an "arbitrary or an undue intrusion" of a protected relationship. Id. at *5. Here, unlike in Garten, the Plaintiff asserts that there was no legitimate reason supporting the allegations with respect to the protected relationship.

Taking the Plaintiff's allegation as true, as the Court must on a motion to dismiss, the Plaintiff's intimate association claim survives. Stated otherwise, the Plaintiff has adequately pled an intimate association claim, and the Brookhaven Defendants' motion to dismiss that claim is denied.

D.  The First Amendment Retaliation Claims: Speech and Petition

A First Amendment retaliation claim requires that the plaintiff show "(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action." Dawes v. Walker, 239 F.3d 489, 492 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema N .A., 534 U.S. 506, 122 S. Ct. 992, 152 L. Ed. 2d 1 (2002).

The Defendants argue that since the Plaintiff was not denied access to engage in a protected activity, no First Amendment violation occurred.  However, "[t]he right of access to the courts and to petition the government includes the right to be free from retaliation for the exercise of such right." Gusler v. City of Long Beach, 823 F. Supp. 2d 98, 133 (E.D.N.Y. 2011), citing Berrios v. State Univ. of N.Y. at Stony Brook, 518 F. Supp. 2d 409, 417 (E.D.N.Y. 2007).

Here, the Court finds that the Plaintiff has plead protected speech and complaints against the Town on his part.  Further, the Brookhaven Defendants do not dispute that they took adverse actions against the Plaintiff.

As to whether there was a causal connection between the alleged protected speech and the adverse actions, the Court finds that the Plaintiff has satisfied this element for pleading purposes.  "To establish a causal connection sufficient to survive a motion to dismiss, the 'allegations must be sufficient to support the inference that the speech played a substantial part in the adverse action.'" Kempkes v. Downey, No. 07-CV-1298 (KMK)(GAY), 2008 WL 852765, at *3 (S.D.N.Y. Mar. 31, 2008) (quoting Davis v. Goord, 320 F.3d 346, 354 (2d Cir. 2003)).  A causal connection is often shown circumstantially, through allegations that the retaliation occurred in "close temporal

proximity" to the protected activity. See id.; Morey v. Somers Cent. Sch. Dist., No. 06-CV-1877 (WCC), 2007 WL 867203, at *11 (S .D.N.Y. Mar. 21, 2007) (collecting cases).

The Plaintiff appears to assert this claim based upon the fact that the Brookhaven Defendants continued the prosecution against the Plaintiff notwithstanding his protestations. However, "although plaintiff's burden in establishing a *prima facie* case of retaliation is 'a light one'[,] it still requires that 'the protected activity precede[ ] the adverse action in order to satisfy the causation requirement." Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001)(citation omitted). In this case, the Second Amended Complaint makes clear that the Brookhaven Defendants began prosecuting the Plaintiff's alleged Town Code violations prior to his alleged protected activities.

Undeterred, the Plaintiff appears to assert this claim based upon the fact that Brookhaven Defendants continued on their course notwithstanding the Plaintiff's protestations. Even if such a claim could support a First Amendment Retaliation claim, the Plaintiff has not alleged that he desired to exercise his First Amendment rights, but was chilled by the Brookhaven Defendants. "The allegation of a chill is indispensable for private plaintiffs." Ford v. Reynolds, 167 F. App'x 248, 250 (2d Cir. 2006), citing Morrison v. Johnson, 429 F.3d 48, 51 (2d Cir. 2005).

The Second Amended Complaint states that the Defendants "desired their conduct to have a chilling effect upon the Plaintiff's exercise of his First Amendment rights." (Second Am. Compl., at ¶ 260). Simply put, the Court finds that the Plaintiff has failed to plausibly set forth facts that would support the claim that the Brookhaven Defendants' actions chilled his First Amendment rights. See also Kuck v. Danaher, 600 F.3d 159, 168 (2d Cir. 2010) (finding that the plaintiff's First Amendment retaliation claim was properly

dismissed when "nothing in the complaint suggests that [plaintiff's] speech was 'actually chilled' as a result of" the defendants' alleged conduct); Curley v. Vill. of Suffern, 268 F.3d 65, 73 (2d Cir. 2001) ("Where a party can show no change in his behavior, he has quite plainly shown no chilling of his First Amendment right to free speech."); Ford v. Reynolds, 326 F. Supp. 2d 392, 403 (E.D.N.Y. 2004) ("Because Plaintiffs have failed to allege any actual chill or deterrence, this Court must conclude that [plaintiffs] did not suffer the harm necessary to support their retaliation claim."), aff'd,167 F. App'x. 248 (2d Cir. 2006); Rosendale v. Brusie, No. 07-CV-8149 (CS), 2009 WL 778418, at *11 (S.D.N.Y. Mar. 25, 2009) ("Because the Complaint shows that Plaintiff continued to exercise his First Amendment rights despite Defendants' alleged retaliatory conduct, Plaintiff fails to allege actual chilling of his speech."); Balaber–Strauss v. Town/Vill. of Harrison, 405 F. Supp. 2d 427, 433–34 (S.D.N.Y. 2005) (dismissing a First Amendment retaliation claim when the complaint failed to allege that the plaintiff refrained from speaking at the public Town meeting after the defendants engaged in a "smear campaign").

Indeed, the Court notes that, during and after the alleged protected activity, the Plaintiff continued to write letters to various departments within the Town and to the Criminal Court, both the trial judge and administrative judge.

For the foregoing reasons, the Plaintiff's First Amendment retaliation claim is dismissed. Although the Plaintiff may be able to plead a "chilling effect," given that the complaint has been amended twice already, the Court declines to afford the Plaintiff an additional opportunity to re-plead this claim.

E. <u>The New York State Law Malicious Prosecution Claims</u>

To prevail in an action for malicious prosecution under New York law, the Plaintiff must show: "1) the initiation of an action by the defendant against [her], 2) begun with malice, 3) without probable cause to believe it can succeed, 4) that ends in failure or, in other words, terminates in favor of the plaintiff." <u>Engel v. CBS, Inc.</u>, 145 F.3d 499, 502 (2d Cir. 1998) (quoting <u>O'Brien v. Alexander</u>, 101 F.3d 1479, 1484 (2d Cir. 1996), <u>certified question accepted</u>, 92 N.Y.2d 867, 700 N.E.2d 310 (1998) and <u>certified question answered</u>, 93 N.Y.2d 195, 711 N.E.2d 626 (1999).

Here, the Brookhaven Defendants argue that the Plaintiff cannot meet the fourth element – favorable termination. In particular, the Brookhaven Defendants contend there has not been a favorable termination because a dismissal under CPL § 170.35 does not reach the merits of the charges and thus the "question of plaintiff's guilt or innocence remains unanswered." (Brookhaven Defs. Mem. at 17).

However, "New York law does not require a malicious prosecution plaintiff to prove his innocence, or even that the termination of the criminal proceeding was indicative of innocence." <u>Anilao v. Spota</u>, 774 F. Supp. 2d 457, 507 (E.D.N.Y. 2011). Instead, the plaintiff's burden is to demonstrate a final termination that is not inconsistent with innocence. <u>See e.g.</u>, <u>Cantalino v. Danner</u>, 96 N.Y.2d 391, 729 N.Y.S.2d 405, 754 N.E.2d 164 (2001) ("[T]he question is whether, under the circumstances of each case, the disposition was inconsistent with the innocence of the accused.").

That said, in <u>MacFawn v. Kresler</u>, 88 N.Y.2d 859, 644 N.Y.S.2d 486, 666 N.E.2d 1359 (1996), the Court of Appeals of New York held that dismissal without prejudice of an information for insufficiency under CPL 170.35(1)(a) could not serve as the basis for a malicious prosecution claim. "The principal rationale is that dismissals of these types

32

may not end the state's pursuit of the accused on the same charges, for a renewed prosecution may be commenced in a proper court on a facially sufficient pleading . . . ." Colon v. City of New York, 09 CV 0008 (JBW), 2012 WL 691544, at *7 (E.D.N.Y. Feb. 9, 2012), report and recommendation adopted, 09-CV-8, 2012 WL 686878 (E.D.N.Y. Mar. 2, 2012).

The Plaintiff acknowledges that six of the accusatory instruments were dismissed pursuant to CPL §170.35 as they were deemed to be insufficient. Therefore, based on controlling precedent, this Court finds that this dismissal cannot serve as the basis for a malicious prosecution claim under New York law.

Similarly, "[a] dismissal in the interest of justice under CPL 170.40 is not a 'judicial determination of the accused's innocence on the merits.'" DiCecilia v. Early, 234 A.D.2d 335, 336, 651 N.Y.S.2d 94 (2d Dep't 1996); Lynch v. Suffolk Cnty. Police Dep't, Inc., 348 F. App'x 672, 674 (2d Cir. 2009)(a "plaintiff cannot state a § 1983 claim for malicious prosecution in connection with the misdemeanor charges because the charges were dismissed 'in the interest of justice' under New York Criminal Procedure Law § 170.40"). Thus, the eight accusatory instruments that were dismissed pursuant to CPL 170.40 also cannot serve as the basis for a malicious prosecution claim under New York law.

In sum, as the underlying criminal charges upon which the Plaintiff bases his malicious prosecution claims were dismissed pursuant to statutes that did not reach the merits, the Court dismisses these claims.

Unlike claims brought pursuant to Section 1983, under New York State law, municipalities may be held vicariously liable for false arrest and malicious prosecution

under a theory of *respondeat superior*. Williams v. City of White Plains, 718 F. Supp. 2d

374, 381 (S.D.N.Y. 2010). However, having determined that the Plaintiffs fail to state a

New York State malicious prosecution claim against the Individual Defendants, the Court

finds that such a claim against the Town based on *respondeat superior* necessarily fails as

a matter of law. See Shapiro v. Kronfeld, No. 00 CIV. 6286 (RWS), 2004 WL 2698889,

at *24 (S.D.N.Y. Nov. 24, 2004) (where state law claims were dismissed against

individual defendants, claims against municipal defendants based on *respondeat superior*

were dismissed "as there can be no imposition of vicarious liability in the absence of

underlying liability")(citing Wende C. v. United Methodist Church, 6 A.D.3d 1047, 1052,

776 N.Y.S.2d 390 (4th Dep't 2004) (collecting cases)).

F.   The Procedural Due Process Claims

        The Brookhaven Defendants move to dismiss the Plaintiff's Procedural Due

Process claim, arguing that he was afforded sufficient notices and access to a tribunal.

        The Due Process Clause protects against deprivations of "constitutionally

protected interests in life, liberty, or property . . . without due process of law." Rivera–

Powell v. New York City Bd. of Elections, 470 F.3d 458, 464–65 (2d Cir. 2006).

"Review of a procedural due process question involves two steps: the first asks whether

there exists a liberty or property interest which has been interfered with by the State; the

second examines whether the procedures attendant upon that deprivation were

constitutionally sufficient." Martine's Serv. Ctr., Inc. v. Town of Wallkill, 554 F. App'x.

32, 34 (2d Cir. 2014) (internal quotations and references omitted).

        Here, as to the liberty or property interest affected, the Plaintiff identifies an

interest under CPL § 100.15 in not being accused of an alleged crime or offense until a

facially sufficient accusatory instrument exists.  The New York Court of Appeals has explained that this additional showing is required because of the "unique function that an information serves" for prosecuting a misdemeanor or petty offense because there is no preliminary hearing and no grand jury. People v. Alejandro, 70 N.Y.2d 133, 138, 511 N.E.2d 71 (1987).

"Generally, due process requires that a state afford persons some kind of hearing prior to depriving them of a liberty or property interest." DiBlasio v. Novello, 344 F.3d 292, 302 (2d Cir. 2003) (internal citations and quotation marks omitted).  However, "[w]here a deprivation at the hands of a government actor is 'random and unauthorized,' hence rendering it impossible for the government to provide a pre-deprivation hearing, due process requires only a post-deprivation proceeding." Id. (citation omitted).  Still, "[w]hen the deprivation occurs in the more structured environment of established state procedures, rather than random acts, the availability of postdeprivation procedures will not, *ipso facto*, satisfy due process." HANAC v. City of New York, 101 F.3d 877, 880 (2d Cir. 1996) (citing Hudson v. Palmer, 468 U.S. 517, 532, 104 S. Ct. 3194, 82 L. Ed. 2d 393 (1984)).

For example, in Kraebel v. New York City Dep't of Housing Preservation and Dev., 959 F.2d 395, 404 (2d Cir. 1992), the Second Circuit held that since the plaintiff attacked "established state procedures that cause[d] the delays and burdens which deprive[d] her of her property . . . the mere availability of redress in state court [did not satisfy plaintiff's] right to due process."

Here, as to the procedures attendant upon that deprivation, the Plaintiff alleges that the letter orders and appearance tickets were inadequate because the content of the

notices contained vague and general descriptions of the alleged crimes and offenses which were insufficient to reasonably apprise property owners what specifically needed to be fixed.  In this regard, the letter orders allegedly gave imprecise information as to when a compliance inspection would be conducted and did not inform the Plaintiff of his appellate rights, including the right to appeal to the Board of Appeals of the Town of Brookhaven. Brookhaven Code § 85-28, 86A-15; N.Y. Town Law § 267-a.  Moreover, the Plaintiff points to the fact that sections of the eleven of the Appearance Tickets were left blank and that none of the Tickets provided him with sufficient notice of the actual charges against him.  Ultimately, the Plaintiff alleges, the Town and the State Court failed to review the accusatory instruments for facial sufficiency.

Drawing all reasonable inferences in the Plaintiff's favor, as must be done for purposes of this motion, and reviewing the applicable case law, the Court concludes that the Plaintiff has plead facts that a Procedural Due Process violation resulted from "established state procedures," rather than random authorized acts.  For this reason, the availability of post-arraignment motion practice and appeals does not necessarily cure the alleged deprivations of liberty interests.

Based on the foregoing, the motion by the Brookhaven Defendants to dismiss is denied with respect to the Plaintiff's Procedural Due Process claims.

G.  The Equal Protection Claims

The Fourteenth Amendment states in pertinent part: "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws."  U.S. Const. amend. XIV § 1.  According to the Second Circuit, "there are several ways for a plaintiff to plead intentional discrimination that violates the Equal Protection Clause." Pyke v. Cuomo, 258

F.3d 107, 109 (2d Cir. 2001) (quoting <u>Brown v. City of Oneonta</u>, 221 F.3d 329, 337 (2d Cir. 1999)).

Here, the Plaintiff alleges selective prosecution or selective enforcement of the law among other similarly situated properties for inspection of Town Code violations. To prevail on a claim of selective enforcement of the law in violation of the Equal Protection Clause, a plaintiff must prove that (1) "compared to others similarly situated, [he or she] was selectively treated," and (2) "such selective treatment was based on impermissible considerations such as race, religion, intent to inhibit or punish the exercise of constitutional rights, or malicious or bad faith intent to injure a person." <u>Diesel v. Town of Lewisboro</u>, 232 F.3d 92, 103 (2d Cir. 2000) (quoting <u>LeClair v. Saunders</u>, 627 F.2d 606, 609–10 (2d Cir. 1980)); <u>accord</u> <u>Zahra v. Town of Southold</u>, 48 F.3d 674, 683 (2d Cir. 1995). "A plaintiff generally must satisfy both elements to establish a claim of selective enforcement." <u>LaTrieste Rest. v. Vill. of Port Chester</u>, 188 F.3d 65, 70 (2d Cir. 1999).

District courts in this circuit have noted that "[s]imilarly situated does not mean identical, but rather 'a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases,' to the extent that an 'objectively identifiable basis for comparability' exists." <u>Walker v. City of New York</u>, No. 05–CV–1283 (RER), 2010 WL 5186779, at *7 (E.D.N.Y. Dec. 15, 2010) (quoting <u>Graham v. Long Island R.R.</u>, 230 F.3d 34, 39 (2d Cir. 2000). In other words, a plaintiff "must identify comparators whom a 'prudent person would think . . . [were] roughly equivalent.'" <u>Abel v. Morabito</u>, No. 04 Civ. 07284 (PGG), 2009 WL 321007, at *5 (S.D.N.Y. Feb. 11, 2009) (quoting <u>Estate of Morris v. Dapolito</u>, 297 F. Supp. 2d 680, 686 (S.D.N.Y. 2004)).

That said, the Second Amended Complaint is devoid of a single similarly situated property which purportedly received different treatment than the "Norfleet Property." Rather, the Second Amended Complaint merely states that "[u]pon information and belief, the Norfleet Property was selected for investigation among other similarly situated properties for inspection of latent Town Code violations." (Second Amend. Compl. at ¶ 290.). Because this is a conclusory reference to unspecified similarly situated persons without accompanying examples, the Plaintiff has failed to satisfy the first element of a selective enforcement claim. Ruston v. Town Bd. for Town of Skaneateles, 610 F.3d 55, 59 (2d Cir. 2010) (the plaintiffs failed to state viable equal protection claim where they merely alleged less favorable treatment than "similarly situated" persons but did not plead specific examples); MacPherson v. Town of Southampton, 738 F. Supp. 2d 353, 371 (E.D.N.Y. 2010) (conclusory references to unspecified "similarly situated" persons without examples is insufficient to withstand a motion to dismiss for selective enforcement).

To the extent the Plaintiff attempts to compare himself to his two brothers – Howard and Richard, who were joint owners of the Norfleet Property but were not criminally prosecuted – to substantiate his selective enforcement claim, such a comparison fails to satisfy the first element of a selective enforcement claim. As the Plaintiff concedes, he is the majority owner of record (50% interest) in the "Norfleet" property, whereas his brothers own only 25% interest each.

To be sure, whether people are similarly situated, "[a]s a general rule . . . is a factual issue that should be submitted to the jury." Harlen Assocs. V. Inc. Village of Mineola, 273 F.3d 494, 499 n. 2 (2d Cir. 2001). However, where, as here, the Plaintiff

fails in his pleadings to point to any examples of similarly situated properties, the Court

declines to allow this claim to proceed.

H.  The Civil Rights Law Claims – Unlawful Search and Seizure

The Plaintiff also claims an unlawful search and seizure in violation of Section 8

of the New York Civil Rights Law.  That section provides:

> The right of the people to be secure in their persons, houses, papers and
> effects, against unreasonable searches and seizures, shall not be violated;
> and no warrants can issue but upon probable cause supported by oath or
> affirmation, and particularly describing the place to be searched, and the
> persons or things to be seized.

In opposition, the Defendants contend that this is, in fact, a claim under the New

York State Constitution and must be dismissed, and that courts in this circuit have held

that there is no private right of action under the New York State Constitution where

remedies are available under 42 U.S.C. §1983.  However, the Defendants cite no case law

for the proposition that claims under Section 8 of the New York Civil Rights Law are

duplicative of, or in essence, claims under the New York State Constitution.  Indeed, case

law regarding this statutory provision is sparse at best.  Under these circumstances, at this

stage of the litigation, the Court declines to dismiss the cause of action under Section 8 of

the New York Civil Rights Law.

I.  The Requests for Declaratory Relief

The Declaratory Judgment Act provides:

> In a case of actual controversy within its jurisdiction, . . . any court of the
> United States, upon the filing of an appropriate pleading, may declare the
> rights and other legal relations of any interested party seeking such
> declaration, whether or not further relief is or could be sought.

28 U.S.C. § 2201(a). "[T]he phrase 'case of actual controversy' in the [Declaratory Judgment] Act refers to the type of 'Cases' and 'Controversies' that are justiciable under Article III." MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118, 127, 127 S. Ct. 764, 166 L. Ed. 2d 604 (2007) (quoting Aetna Life Ins. Co. v. Haworth, 300 U.S. 227, 240, 57 S. Ct. 461, 81 L. Ed. 617 (1937)). "It is a basic principle of Article III that a justiciable case or controversy must remain 'extant at all stages of review, not merely at the time the complaint is filed.'" United States v. Juvenile Male, ⸺U.S. ⸺, 131 S. Ct. 2860, 2864, 180 L. Ed. 2d 811 (2011) (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 67, 117 S. Ct. 1055, 137 L. Ed. 2d 170 (1997)); see also Alvarez v. Smith, 558 U.S. 87, 92, 130 S. Ct. 576, 175 L. Ed. 2d 447 (2009) ("The Constitution permits this Court to decide legal questions only in the context of actual 'Cases' or 'Controversies.' An 'actual controversy must be extant at all stages of review, not merely at the time the complaint is filed.'")(quoting Preiser v. Newkirk, 422 U.S. 395, 401, 95 S. Ct. 2330, 45 L. Ed. 2d 272 (1975) (internal citation omitted)). "[T]he question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." MedImmune, Inc., 549 U.S. at 127, 127 S. Ct. 764.

"Throughout the litigation, the party seeking relief must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." Juvenile Male, 131 S. Ct. at 2864. "As with any federal action, courts may not entertain actions for declaratory judgment 'when the parties are asking for an advisory opinion, when the question sought to be adjudicated has been

mooted by subsequent developments, and when there is not standing to maintain the action.'" <u>Velvet Underground v. Andy Warhol Found. For the Visual Arts, Inc.</u>, 890 F. Supp. 2d 398, 403 (S.D.N.Y. 2012) (quoting <u>Flast v. Cohen</u>, 392 U.S. 83, 95, 88 S. Ct. 1942, 20 L. Ed. 2d 947 (1968)).

In this case, the Plaintiff seeks declaratory relief against the Town to, among other things, stop the Town's allegedly unlawful practices and declare the Rental Law as violative of New York Town Law § 262. The Brookhaven Defendants argue that (1) there is no case or controversy against the Town; (2) an Article 78 proceeding is the more appropriate vehicle for the Plaintiff to seek declaratory relief; and (3) the Rental Law is presumed valid. The Court addresses each argument in turn.

First, the Court finds that the Second Amended Complaint pleads an actual case or controversy to support a claim for declaratory relief against the Town. For instance, the Plaintiff seeks to stop the Town's allegedly unlawful practices, including granting housing inspectors assigned to the DHHS the authority to issue and serve certain appearance tickets.

Relatedly, since the Plaintiff seeks declaratory relief after he has been criminally prosecuted as a result of the practices he challenges, his claim is ripe for adjudication. <u>Dow Jones & Co., Inc. v. Harrods, Ltd.</u>, 237 F. Supp. 2d 394, 406-07 (S.D.N.Y. 2002) (stating that "a touchstone to guide the probe for sufficient immediacy and reality is whether the declaratory relief sought relates to a dispute where the alleged liability *has already accrued*")(emphasis added), <u>aff'd</u>, 346 F.3d 357 (2d Cir. 2003)

Second, "a proceeding under article 78 is not the proper vehicle to test the constitutionality of legislative enactments." <u>Matter of Kovarsky v. Hous. & Dev. Admin.</u>

Of City of N.Y., 31 N.Y.2d 184, 191, 335 N.Y.S.2d 383, 286 N.E.2d 882 (1972). Rather,

a declaratory judgment action, as here, is appropriate. Bloom v. Mayor of City of New

York, 35 A.D.2d 92, 97 (2d Dep't 1970), aff'd, 28 N.Y.2d 952 (1971) (stating that "in a

declaratory judgment action the court may not only review the constitutionality of the

statute, but also determine whether a public official acted in regard to the statutory

standard, or in excess of the grant of authority, or in violation of due process"). In any

event, the Defendants concede that the existence of an alternative remedy for the

Plaintiff, such as a proceeding under Article 78, does not nullify his ability to request a

declaratory judgment.

Third, even if the Rental Law is presumed valid, that does not immunize it from

challenge. As stated above, the Plaintiff alleges that the Rental Law is invalid in that it

violates New York Town Law § 262's uniformity requirement. Among other things,

Town Law § 262 requires that all land use regulations within a designated zoning district

"shall be uniform for each class or kind of buildings, [sic] throughout such district." This

uniformity mandate "is intended to assure property holders that all owners in the same

district will be treated alike and that there will be no improper discrimination." Matter of

Augenblick v. Town of Cortlandt, 104 A.D.2d 806, 814 (2nd Dep't 1984) (Lazer, J.P.,

dissenting) revd 66 N.Y.2d 775, 777, 66 N.Y.2d 775488 N.E.2d 109 (1985) ("Order

reversed . . . and petition granted for the reasons stated in the dissenting memorandum by

Justice Leon D. Lazer at the Appellate Division").

Here, the Plaintiff alleges discriminatory treatment against dwellings that are

rented in that they are subject to, among other things, on-site inspections, application for

and renewal of rental permits, and the signing of an affidavit attesting to certain

information.  These allegations are sufficient to state a claim for declaratory relief challenging the Town Rental Law.

However, the Court reaches a different conclusion with respect to the desired declaratory relief against the County.  In essence, the County argues that it cannot be subjected to liability here because the District Attorney's actions were undertaken in a prosecutorial capacity.  According to the County, when a district attorney acts in a prosecutorial capacity, the district attorney acts as an officer of the state, and thus, the County cannot be held liable for the district attorney's actions because the district attorney is acting on behalf of the state, not the county.

"District attorneys are generally considered to be local officers of their respective counties." Conte, 2010 WL 3924677, at *27.  Thus, "where a district attorney acts as the manager of the district attorney's office, the district attorney acts as a county policymaker." Pinaud, 52 F.3d at 1153–54 n. 14 (internal quotation marks and alterations omitted).  However, a county cannot be liable for the acts of a district attorney related to the decision to prosecute or not prosecute an individual. See id. at 1153–54 (finding no municipal liability for actions of an Assistant District Attorney unless related to management of office or history of negligence).  "When prosecuting a criminal matter, a district attorney in New York State, acting in a quasi-judicial capacity, represents the State, not the county." Baez v. Hennessy, 853 F.2d 73, 77 (2d Cir. 1988).  Thus, "the County cannot be said to be responsible for the conduct at issue." Id.

However, when "a plaintiff's claims center[ ] not on decisions whether or not, and on what charges, to prosecute but rather on the administration of the district attorney's office, there can be liability against a New York county for an alleged malicious

prosecution." <u>Pinaud</u>, 52 F.3d at 1153–54 n. 14 (internal quotation marks and citation omitted). Thus, "an allegation of deficiencies in the 'management of the [district attorney's] office' would appear to be necessary . . . in order for any claim of malicious prosecution against the County . . . to stand." <u>Id.</u> at 1153 (citation omitted).

To the extent the Plaintiff argues that the alleged current practices of the District Attorney is administrative in nature and not related to his prosecutorial function, the Supreme Court has examined, in an immunity context, the issue of supervisory liability and failure to adequately train within the office of a prosecutor, and has held that matters of supervision and training with the prosecutor's basic trial advocacy duties will be considered prosecutorial in nature and not administrative. <u>Van de Kamp</u>, 555 U.S. 335, 129 S. Ct. 855, 172 L. Ed. 2d 706.

As noted above, in <u>Van de Kamp</u>, the plaintiff claimed that the district attorney and his chief assistant failed to adequately train and supervise their deputies on the production of impeachment material to defendants, and failed to create an information system for their deputies handling such cases to access such information. The Supreme Court found that absolute immunity barred the claims. While these claims addressed administrative functions, they focused on "a certain kind of administrative obligation — a kind that itself is directly connected with the conduct of a trial." <u>Id.</u> at 344. These functions are distinct from "administrative duties concerning . . . workplace hiring, payroll administration, the maintenance of physical facilities, and the like." <u>Id.</u> The Court reasoned that the failure to supervise and train claims relied upon underlying misconduct by the deputy prosecutors at trial, who were themselves entitled to absolute immunity. <u>Id.</u>

In support of its decision, the Court cited the need to limit the "ease with which a plaintiff could restyle a complaint charging a trial failure so that it becomes a complaint charging a failure of training or supervision would eviscerate <u>Imbler</u> [and its rule of prosecutorial immunity]." <u>Id.</u> at 347; <u>see also</u> <u>Gil v. Cty. of Suffolk</u>, No. 06–cv–1683(LDW)(ARL), 2007 WL 2027736, at *3 (E.D.N.Y. Jul. 9, 2007) (allegations of failure to train by the district attorney cannot "circumvent the bar of absolute immunity" applied to the actions of assistant district attorneys). In rejecting the information system claim, a "more purely administrative task" operable by less "technically qualified individuals other than prosecutors," the Court went further. <u>Van de Kamp</u>, 555 U.S. at 348. It found that absolute immunity applied there as well, because "determining the criteria for inclusion or exclusion [of data in an information system] requires knowledge of the law" and expressed its recalcitrance "to review the [District Attorney's] office's legal judgments." <u>Id.</u>

Here, although the County does not seek to avoid declaratory relief on the grounds of absolute prosecutorial immunity, the Court nonetheless finds that such relief is inappropriate under <u>Van de Kamp</u>. In the Court's view, the Plaintiff's allegation that the District Attorney delegates the prosecution of petty Town offenses to the Town Attorney, without sufficient oversight, is simply another way of claiming that the District Attorney has failed to adequately supervise or train those attorneys in their basic trial advocacy duties. As the practice the Plaintiff challenges is directly related to the District Attorney's discretion to prosecute, the County cannot be held to dictate such policies. Accordingly, the Plaintiff's request for declaratory relief against the County is denied and the Second Amended Complaint as against the County is dismissed in its entirety.

J.   The Monell Claims Against the Town

"A municipality cannot be held liable under § 1983 for the acts of its employees solely on a theory of *respondeat superior*." Vessa v. City of White Plains, 12-CV-6989 (ER), 2014 WL 1271230, at *5 (S.D.N.Y. Mar. 27, 2014).  Rather, in order to sustain a claim for relief pursuant to § 1983 against a municipal defendant, a plaintiff must show the existence of an official policy or custom that caused injury and a direct causal connection between that policy or custom and the deprivation of a constitutional right. Monell, 436 U.S. at 694–95, 98 S. Ct. 2018, 56 L. Ed. 2d 611 ("[A] local government may not be sued under § 1983 for an injury inflicted solely by its employees or agents. Instead, it is when execution of a government's policy or custom . . . inflicts the injury that the government as an entity is responsible under § 1983."); see Torraco v. Port Auth. Of N.Y. & N.J., 615 F.3d 129, 140 (2d Cir. 2010) ("[T]o hold a city liable under § 1983 for the unconstitutional actions of its employees, a plaintiff is required to plead and prove three elements: (1) an official policy or custom that (2) causes the plaintiff to be subjected to (3) a denial of a constitutional right."), quoting Wray v. City of New York, 490 F.3d 189, 195 (2d Cir. 2007).

Here, the Second Amended Complaint alleges that the acts by Quinlan, Moran and Biscardi were acts of policymakers (Second Amend Compl., at ¶ 8-9,11.)  A policy or custom may be established by any of the following: (1) a formal policy officially endorsed by the municipality; (2) actions or decisions made by municipal officials with decision-making authority; (3) a practice so persistent and widespread that it constitutes a custom through which constructive notice is imposed upon policymakers; or (4) a failure by policymakers to properly train or supervise their subordinates, such that the policymakers exercised "deliberate indifference" to the rights of the plaintiff. See Parker

v. City of Long Beach, —— F. App'x ——, 2014 WL 1507707, at *2 (2d Cir. Apr.18, 2014), as amended, (Apr. 21, 2014) (failure to train); Hines v. Albany Police Dep't, 520 F. App'x 5, 7 (2d Cir. 2013) (actions of policymakers); Missel v. Cnty. Of Monroe, 351 F. App'x 543, 545 (2d Cir. 2009) (formal policy and act of a person with policymaking authority for the municipality). Therefore, the Court finds that the Plaintiff has set forth sufficient allegations to support Monell liability against the Town.

The Brookhaven Defendants argue that, in the event this Court grants absolute immunity to the Individual Defendants, the Monell claims must be dismissed. However, "'municipalities have no immunity from damages for liability flowing from their constitutional violations.'" Askins v. Doe, 727 F.3d 248, 254 (2d Cir. 2013)(quoting Lore v. City of Syracuse, 670 F.3d 127, 164 (2d Cir. 2012)). Thus, the Brookhaven Defendants' arguments, which "reflect[] a misunderstanding of the relationship between the liability of individual actors and municipal liability for purposes of Monell," should be rejected. Askins, 727 F.3d at 253; Norton v. Islip, No. 04–CV–3079 (NGG)(WDW), 2011 WL 3918220, at *5 (E.D.N.Y. Sept. 2, 2011) (similar argument rejected based on a "disturbing lack of legal comprehension surrounding immunity and Monell liability").

### III. CONCLUSION

In sum, the Court grants in part and denies in part the motion to dismiss by the Brookhaven Defendants' and grants the motion to dismiss by the County. As to the motion to dismiss by the Brookhaven Defendants, the Court denies the motion with respect to the (1) the Section 1983 First Amendment Intimate Association, Fourth Amendment, and Procedural Due Process claims; (2) the corresponding Monell claims against the Town; (3) the claim under Section 8 of the New York Civil Rights Law; and

47

(4) the requests for declaratory relief as against the Town.  The Court otherwise grants

the motion to dismiss by the Brookhaven Defendants.  As there no claims remaining

against Lutzer, the Second Amended Complaint is dismissed in its entirety as to her.

**SO ORDERED.**
Dated: Central Islip, New York
July 30, 2014


                                             *Arthur D. Spatt*_____
                                             ARTHUR D. SPATT
                                             United States District Judge